UNITED  STATES  DISTRICT  COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED  STATES  OF  AMERICA,

        -against-                                18 Cr. 245 (JMF)


PINCUS  DAVID  CARLEBACH,

                    Defendant.
------------------------------------------------------------X


# PRE-SENTENCE MEMORANDUM




**RICHARD A. FINKEL, Esq., & ASSOCIATES, PLLC.**
*Counsel for Defendant Pincus David Carlebach*
270 Madison Avenue, Suite 1203
New York, New York 10016
212-689-8600



Richard A. Finkel
   *of Counsel*

# CONTENTS

*Page*

Index to Letters .................................................................................. ii

Preliminary Statement .................................................................. 1

Personal Background ..................................................................... 2

    Family Background ................................................................ 3

    David's Childhood ................................................................ 5

    David's Education ................................................................. 8

    Marriage .............................................................................. 9

    Law Practice ....................................................................... 10

    David's Immediate Family ................................................. 12

    Developing the Law Practice ............................................. 14

Offense Conduct ........................................................................... 17

    Criminal Charges ................................................................ 18

        State Plea and Detention at Rikers Island ..................... 19

        Disbarment .................................................................... 20

Mitigating Considerations ............................................................ 20

Conclusion and Request ............................................................... 25

**LETTERS**

1.    Salomon Carlebach                  - Father
2.    Elisheva Carlebach                 - Sister
3.    Sarah Carlebach Marmorstein        - Sister
4.    Emanuel Carlebach                  - Brother
5.    Yonah Carlebach                    - Brother
6.    Abraham Carlebach                  - Brother
7.    Joseph Z. Carlebach                - Brother
8.    Joseph Carlebach                   - Son
9.    Michal Carlebach                   - Daughter
10.   Tammy (Cheyna) Carlebach          - Daughter

11.   Akiva Homnick                      - Rabbi, N.Y.S. Chaplains Task Force
12.   Yitzchok Fingerer                  - Rabbi, The Brooklyn Jewish Experience
13.   Samuel Fishelis                    - Rabbi, The Sages of Israel
14.   Abraham Laks, Esq.                 - Rabbi, The Eldridge Street Synagogue
15.   Zvi Romm                           - Rabbi, The Bialystoker Synagogue
16.   Baruch Stein                       - Rabbi, Mesivta Tifereth, Jerusalem
17.   Chaim Katz                         - Synagogue, The Sages of Israel
18.   Eli Nochlin                        - Synagogue, Anshe Meseritz
19.   Ben Hirsch                         - Survivors for Justice
20.   Chaim Pinkesz                      - MARCH (Mothers Alone Raising Children)
21.   Sarah Buzaglo                      - Daughter's Friend
22.   Ezra Turkel                        - Friend
23.   Roy Hoffmann, CPA                  - Rikers Island Inmate
24.   Eli Miles                          - Client
25.   Feige Green                        - Client

**EXHIBIT**

FEDCAP Certificate

## PRELIMINARY  STATEMENT

On March 28, 2018, Pincus David Carelbach (known to most friends as David), pled guilty before this Honorable Court, pursuant to a written plea agreement with the United States Attorney, to a one count Information charging embezzlement from a bankruptcy estate (18 USC §153) for which he served as counsel in January and February 2016.

It is well recognized that one of the most sensitive and difficult responsibilities of the judiciary is the sentencing decision.  Since the Supreme Court's landmark decision in *United States v. Booker*, 543 US 220 (2005), that made the Sentencing Guidelines "advisory" and caused the return to the primacy of judicial discretion pursuant to 18 USC section 3553, the role and responsibility of the sentencing Judge has been rendered all the more formidable. This Pre-Sentence Memorandum is respectfully submitted to assist this Honorable Court in exercising its discretion and determining the appropriate sentence for David Carelbach.

After *Booker,* and the subsequent decisions of the United States Supreme Court in *Nelson v. United States*, 555 US 350 (2009), *Kimbrough v. United States,* 552 US 85 (2007), *Gall v. United States,* 552 US 38 (2007), *Rita v. United States,* 551 US 338 (2007), it is now absolutely clear that, "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime.  . . .[T]he district court must form its own view of the 'nature and circumstances of the offense and the history and characteristics of the defendant.'" *United States v. Cavera*, 550 F3d 180, 188 (2d Cir 2008)(*en banc*).  The Supreme Court's decision in *Gall* made it clear that the sentencing inquiry is to be broad, open-ended, significantly discretionary and on an individualized basis.

It is settled that under the post-*Booker* sentencing regime, the Guidelines are a guide;  they are simply "advisory."  In fact, a District Court must conduct its own independent review of the

1

statutory sentencing factors and may not presume that the Guidelines recommended range is reasonable. *United States v. Rita, supra;  United States v. Gall, supra; Nelson v. United States, supra*; *United States v. Cavera, supra*.  Thus, the clear goal of the post-*Booker* sentencing scheme has been to allow the sentencing court to reach an informed and individualized judgment in each case by reviewing the factors set forth by 18 USC §3553(a).  A full and complete understanding of the defendant enables the court to comply with the dictates of section 3553 and of the Supreme Court for individualized sentencing.

In this Pre-Sentencing Memorandum, we present David Carlebach's personal history, the circumstances of the offense, and the mitigating factors that we respectfully ask this Court to consider in making its sentencing decision.

Mr. Carlebach recognizes that he made a terrible mistake, he is extremely remorseful for his conduct.  Upon consideration of the facts of the charge to which Mr. Carlebach has pled, upon a review of David's background and personal history, and upon the application of the various sentencing factors of section 3553(a), we respectfully request that the Court impose a non-guideline sentence below the advisory range, concurrent with the sentence to be imposed in the parallel State action.  We respectfully suggest that a sentence below that recommended by the advisory Guidelines will "be sufficient but not greater than necessary" to fulfill the purposes of sentencing.  §3553(a).

## PERSONAL  BACKGROUND

David Carlebach was born to his parents Salomon and Maud Carlebach on April 8, 1960. David was the fifth of seven children, and the family lived in the Crown Heights section of Brooklyn. His four older siblings as well as David were all born within approximately a year of each other.  His next brother was born four years later and the youngest sibling, a brother, was born two years thereafter.  His two oldest siblings were girls, his other siblings are brothers.

2

**Family Background**

David's father, Salomon, was the scion of a prominent Rabbinical family in pre-war Germany. His paternal grandfather, Rabbi Dr. Salomon Carlebach, was the chief Rabbi of a German city Lübeck, and the family traced its lineage back to the famous bible commentator Rashi.

Rabbi Dr. Salomon Carlebach of Lübeck, was the father of twelve children including eight sons. Five of the his sons became prominent Rabbis throughout Germany, including David's grandfather Rabbi Dr. Joseph Carlebach who became the Chief Rabbi of Hamburg. David was named after an uncle, Rabbi Dr. David Carlebach, who was the Chief Rabbi of Halberstadt Germany.

During the 1920's and 1930's, David's grandfather, Joseph Carlebach, was recognized as one of the most prominent leaders of Orthodox Jewry in Germany. As the Nazis gained control of Germany and as attacks on the Jewish population increased, Rabbi Joseph Carlebach was one of the only orthodox rabbis who refused to leave Germany and remained to lead and counsel the Jews of Germany. While he insisted on remaining in Germany, he sent his five oldest children on what became known as the *kindertransport* to England.[1] When the Nazis rounded up the Jews of Hamburg, Rabbi Joseph Carlebach, with his wife and four younger children, including David's father Salomon, were shipped to the Jungerhof concentration camp.

David's father Salomon, who was 16 years old, was deemed fit to work, was forcibly separated from his family and sent to the first of a series of Nazi Labor camps. He never saw his parents and these three siblings again as they were murdered on March 26, 1942 during the mass

---

[1] The sister of David's father (David's aunt), Professor Miriam Gillis-Carlebach, emigrated to Israel in October 1938, where she taught Education and Hebrew at Bar-Ilan University, in Ramat Gan, Israel. In 1992 she became the head of the Joseph Carlebach Institute at Bar-Ilan University and has dedicated herself to researching her father's writings as well as the writing of other Jewish leaders of the same time period and chronicling the life of Carlebach family during the years immediately preceding Nazi control of Germany and Europe.

3

shooting of approximately 1600 Jews that became known as the Dünamünde Action in the Biķernieki forest, near Riga, Latvia. Salomon spent four years in nine different concentration and forced labor camps, until liberated. Following liberation, David's father spent two years in displaced persons camps in Germany, finally succeeding in securing passage to the United States in 1947. Born into the most prominent Rabbinic family of Germany, he survived the privations but lost most of his family to the Nazis, and arrived in New York with only the clothes on his back.

Upon arriving in New York, David's father was assisted by his Uncle and Aunt, Rabbi Naftali and Paula Carlebach. Rabbi Naftali Carlebach had emigrated to the U.S. in 1939, and had become a Rabbi on the Upper West Side of Manhattan. Rabbi Naftali's synagogue remains an active synagogue and is now known as the Carlebach Shul. With his uncle's help, David's father returned to religious study as a student at the highly respected Orthodox Yeshiva Rabbi Chaim Berlin in Brooklyn. At the same time he enrolled at City College, studying accounting.

In June of 1953, Solomon married David's mother Maud Katzenstein who lived in the Washington Heights section of New York City. Maud was born in Frankfurt, Germany, and was the oldest of three children. Maud's father Manfred, had been a successful accountant in Frankfurt. As a prominent member of the Orthodox Jewish community of Frankfurt, he was arrested by the Nazis shortly after Kristallnacht, and was sent to the Tereisenstadt concentration camp. Manfred's wife was able to arrange for his release, and the family immediately fled Germany. They arrived in New York in 1938, with their family. Maud was four years old. While they were extraordinarily fortunate, first, to secure Manfred's release from Nazi custody, and second, to succeed in escaping from Germany, they arrived in New York with only the clothes they were wearing. Despite this impoverished beginning, Manfred founded a successful plastics manufacturing business in New Jersey, supplying products to the auto industry and today it is run by his children and grandchildren.

4

Maud was introduced to Salomon at the age of 19 when he was 27. Salomon was a star student at his Yeshiva and the prestigious Carlebach name was familiar to Maud and her parents. Maud was also a leader among younger member groups of the Jewish Orthodox community.

At the time of their marriage, Salomon had already begun working in the accounting profession, and wanted to continue his studies to become an accountant. Maud, however, wanted him to pursue religious studies and become a Rabbi and Teacher. Salomon acceded to her wishes, and he gave up the accounting profession and devoted himself to full time religious studies. He began teaching high school at the highly regarded Yeshiva of Eastern Parkway, Brooklyn.

While it was David's mother Maud who pressed Salomon to give up accounting, her parents were very disappointed and were not supportive. The resulting friction with Maud's parents proved to be source of great stress especially for Maud throughout the years.

**David's Childhood**

With Salomon teaching, he and Maud began to raise a family, and between 1954 and 1960 Maud gave birth to five children; the two eldest, girls, Elisheva and Sarah, then three sons, Joseph, Jonah and David on April 8, 1960. ████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
        ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

[redacted]

[redacted]

> [redacted]

*See also* Letters of David's Brother Joseph Carlebach, and his sister Sarah Carlebach Marmorstein.

[redacted]

[redacted]

[redacted]

[redacted]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

**David's Education**

Shortly after David was born, the family moved from the apartment in the Crown Heights section of Brooklyn to a home in East Flatbush.  From there David attended the Yeshiva of Eastern Parkway, one of the premier orthodox Jewish day schools in Brooklyn.████████████████████

████████ David was exceptionally bright and did well at school.  David's father Salomon also progressed in his teaching career, and in 1967 he was appointed as Dean of Students at the Rabbinical school he had attended, Yeshiva Chaim Berlin.  As this Yeshiva moved to the Midwood section of Brooklyn,  David's family relocated in 1968, and moved into a home in the same neighborhood.  Additionally, David was transferred to Yeshiva Chaim Berlin, where he was a prodigious student.  He skipped two grade levels in elementary school and graduated High School with a full regents Diploma at the age of 15 in 1975.  Thereafter he studied three more years in the Post Graduate Rabbinical School of Yeshiva Chaim Berlin until the age of 18.  At 18 David traveled to Israel to meet Israeli relatives and to tour the holy land.  David remained in Israel and continued Rabbinical and Talmudical Studies at the Mirrer Yeshiva in Jerusalem.

The Mirrer Yeshiva is was a noted institution for both size and the level of scholarship. David studied there for four years from 1978 to 1982, returning to the United States once a year for the High Holidays and for an occasional wedding or similar family celebration.  David was generally

8

successful in Jerusalem and developed into a promising young Talmud scholar.  He returned to the United States in 1982, where he joined Beth Medrash Govoha the pre-eminent Talmudical Academy in America located in Lakewood, New Jersey.

In Lakewood, David began contemplating his future, and dating the purpose of marriage. However, after two years of study in Lakewood, at the age of 24, David abruptly left the Yeshiva and returned home.  Although, he had been trying to fulfill his perceived destiny as a Talmud scholar and Rabbi, and had realized a reasonable measure of success, ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████  Therefore, in about 1985, David began secular studies at Touro College in N.Y.C.  In 1987 David graduated *Magna Cum Laude* with a degree in Political Science and History.  David then started at Cardozo Law School.

### Marriage

During his first semester of law school, David met his wife Yocheved Jotkowitz who resided

9

in Monsey New York.  They were married in 1988, when David was 27 and Yocheved was 19 years

old, and it quickly became apparent that it would be a difficult marriage. ████████████

████████████████████████████████████████████████

████████  Yocheved  lacked the ability to be empathetic and supportive which were qualities David

sorely needed in a spouse.  Nonetheless David did not contemplate divorce as he hoped that with

therapy and counseling, the marriage could be saved. Moreover, divorce was unheard of in his family

and was contrary to the norms of the religious community in which they lived.

**Law  Practice**

In law school, David achieved success.  He was accepted as a member of the Law Review,

published a Note in the Law Review, and was graduated in the top 20% of his class in 1990.  Upon

graduation, David found the job market for attorneys very difficult as a result of the stock market

crash of 1987.  Ultimately, David found employment in September of 1990 with a small boutique

bankruptcy and litigation firm: Backenroth & Grossman.  The practice was mostly representing small

businesses and real estate companies as debtor's in Chapter 11 and bankruptcy litigation. The

majority of the client base was the Orthodox and Hasidic Jewish Community and David's deep roots

in that community allowed him to develop good rapport with the clients.  There was also a fair

amount of commercial litigation for a similar client base.  David developed skills both as a

bankruptcy practitioner as well as a commercial litigator during his tenure with that firm.

After about four years, in May of 1994, David opened his own bankruptcy firm at 40

Exchange Place near the New York Stock Exchange.  With the permission and consent of the owners

of the firm, a number of those clients followed David to his new practice.  David had also developed

his own group of clients at his firm.  The practice was reasonably successful, although the majority

of the client base was the Orthodox and Hasidic Jewish Communities.

Between 1994 and 1998, David built his practice, and branched out from representing Debtor's to also representing Creditor committees.  Initially, David won some hotly contested "beauty contests" where a number of firms would compete to represent committees.  David beat out some larger firms as a result of his commitment to keep legal costs down and raise creditor recoveries.  David lived up to his commitment as his average legal bill was a fraction of typical committee counsel bills and his creditor recoveries were above national averages.  David achieved these results by taking an aggressive tack with existing management as well as engaging in litigation. *See, e.g., In re America's Hobby Ctr*, 223 BR 275 (Bankr. S.D.N.Y. 1998)(Court granted Creditor Committee represented by Mr. Carlebach retroactive right to sue debtor).

Thereafter, in or about 1998 David was approached by some homeowners in the Orthodox Jewish Community who were in the process of being defrauded out of their homes and life savings by some builders and lenders within the Jewish community.  Their adversaries were very wealthy, prominent and connected community individuals.  David took the case despite the possible community repercussions, and battled for almost six years to save their homes.  David's adversaries fought by making a concerted effort to destroy David's practice.  They even approached David's existing clients and pressed them to change attorneys, and spread the word in the Jewish community that David was not to be retained as counsel.  They also attempted more subtle means to adversely affect David's law practice, including to set David up with "straw" clients in order to create ethical issues and conflicts that would disqualify him from existing clients.  David's practice suffered greatly, but he did not waiver. ████████████████████████████████ David has a heightened empathy and sensitivity for people who are victimized.  He also viewed it as a part of his religious obligation to stand up to people who purported to be religious but whose conduct belied religious principles.  David's conduct left a great impression on many members of the Orthodox

11

business and legal community, that he would not be bought, threatened or cajoled from doing the right thing. This became a hallmark of David's practice and conduct.  *See* Letter of Eli Miles.  He also viewed this as part of his spiritual legacy from his forebearers who always put the well being of their communities first and foremost even at the expense of their own well being.  Painfully, David now understands that his actions, that bring him before this Honorable Court and before the New York State Supreme Court in the parallel indictment, are completely contrary to the ideals that defined his earlier practice of law and the antithesis of the religious principles that he thought was his foundation and heritage. By promptly pleading guilty, David believes he has made his first step to return to the laudable and lawful principles that will again govern his life.  He also recognizes and agonizes that the reputation he earned through honesty and by assisting others has been lost.

During the pendency of defending the homeowners from fraud, David's practice suffered another blow as a result of the September 11th tragedy in 2001, as his office was shut for almost two months given its proximity to ground zero.  Recovering from the economic and psychological blows of both 9-11 and the homeowner case proved to be formidable and was never fully achieved.

**David's  Immediate  Family**

Despite their many difficulties, David and Yocheved began raising their own family, and had four children between 1991 and 1997.  His oldest child, a girl Michelle (also known a Michal), was born in 1991, followed by his son Joseph in 1992. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

――――――――――――――――――

[2]████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████ and has a special relationship with David upon whom she relies for advice and emotional support.  In 1997 David and his wife had twin girls, Robin and Tammy ("Chuma" and "Cheyna").  ████████████████████████████

███████████████████████████████████████████████████████████████████

While he and Yocheved continued to have children, their marriage was marred by constant strife and stress.  David continuously tried to repair and improve the marriage by seeking professional assistance with numerous therapists and marriage counselors.  While David turned to professionals for help, and brought Yocheved with him to the professionals, she often opposed counseling and therapy.  Despite David's efforts, the marriage did not improve.

David's prime goal was to be an excellent parent to his children, ███████████████ His efforts, however, were hampered by Yocheved's persona ███████████████████████ ████████████████████████████████ It was also necessary for David to work long hours to earn the funds required for his children's tuition expenses at the costly private schools necessary to provide them with the Orthodox Jewish Education both he and his wife deemed essential.

████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

---

[3] ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████

13

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████

While David remained dedicated to his family and actively pursued his law practice, he also continued to be an active member of the Orthodox Jewish community.  David constantly volunteered his Rabbinical and Cantorial talents wherever they were needed, always without compensation.  He also gave significant free legal advice to community organizations as well as individuals in need.

**Developing the Law Practice**

By approximately 2003, David's law practice began to stabilize.  Focused on bankruptcy law, David assisted individuals and business in the community who were in distress.  David saved numerous homes from being foreclosed, and reorganized many business and real estate companies that were income sources for many families and individuals.  David also was instrumental in successfully resolving many community disputes, some of which had spilled over into the courts, and facilitated and was party to many successful mediations.

For example, David was approached by a group of teachers in an orthodox girls school who were owed hundreds of thousands of dollars in back pay.  The management was selling the school building for millions, had a grant for a new building, but was going to shortchange the teachers.

14

Most of these teachers were very pious and humble individuals who had dedicated their lives to education even while working without pay, but believed the promises of the owner that when the building was sold they would be paid. David moved to terminate exclusivity and proposed a committee plan that would apply the grant money first to pay the teachers, not build a new school. David presented his proposal to the Court, which had supported the plan for a new building, and convinced the court that the teachers and creditors should be paid before a new school was built. As a result, a mediator was appointed, and the dispute was resolved satisfactory to the teachers.

In or about 2005 David became aware that a teacher/Rabbi in the in one of the prominent local Yeshiva's had been molesting children in his care for over 40 years. Apparently, the school administration was aware of the abuse, but had actively silenced the victims and their parents through intense community pressure. David, was undeterred by the pressure from the school and some other community members, and was determined to have this Rabbi removed from access to children. Although he had not been a victim of sexual abuse, ██████████████████ ███████████████████████████████████████████████ He therefore was especially empathetic and sensitive to the trauma of sexual abuse, especially the irreparable damage it caused to the psyche and healthy emotional development. David joined with another community activist, Ben Hirsch, to form an organization and wage a full fledged war against this Rabbi, including blanketing the community with leaflets, extensive media coverage and the commencement of litigation by many of the victims. As a result, the Yeshiva was forced to discharge the Rabbi, who was subsequently arrested and charged with endangerment of children and related charges. Mr. Hirsch in his letter to Your Honor, writes that as a result of his efforts with David, they established an organization, Survivors for Justice, the first advocacy group for victims of sex abuse in the Orthodox Jewish community. Thus, starting from their efforts to assist one victim in 2005, they have

15

worked to save and help many more, and "[m]any hundreds of victims have stepped forward and are now being treated with compassion and respect by a community that had shunned earlier victims." Letter of Ben Hirsch, President of Survivors for Justice.  Mr. Hirsch also writes that David spent "hundreds of hours ... selflessly dedicated to helping victims," and that David opened himself and his family to substantial risks of ostracism from the community in which he and his family lived and worshiped, and the community that formed the base for most of the clients of his law practice.

As time went on David's marriage continued to deteriorate, to the point where he and Yocheved had no relationship at all.  David, however, believed that divorce was not a realistic option because of the impact that it would have on his children, especially that it would create substantial obstacle for his children to find a suitable marriage match in their Orthodox Jewish community. The deterioration of David's marriage also had a very detrimental effect on his emotional well being and therefore on his law practice as well.  Circumstances became so stressful that David even avoided the marital home to escape the strife and emotional turmoil that his wife seemed to always present.

In 2012 , David had to deal with another difficulty that adversely affected his law practice: Hurricane Sandy.  As a result of this storm, David's office was again forcibly closed for almost a month as it was the flood and evacuation zone in Manhattan.  David's practice suffered significantly, after 18 years in the Financial District, he was forced to relocate to 55 Broadway.  He hoped that the move would rejuvenate the practice, that he could develop new business, but the move necessitated a threefold increase in his rent.  In an effort to improve his practice, raise his professional profile and attract more financially lucrative clients, David hired new attorneys from Harvard and Stanford.  The move and plans proved disastrous, expenses increased dramatically, the practice did not produce revenue needed to cover the expenses, and his landlord commenced eviction proceedings.

By 2015, David felt as if his personal life and his professional life had both crumbled around

him.  His law practice was not producing sufficient funds to support itself as well as David's family requirements.   In the Orthodox community, he had earned a respected position as a trusted professional, people regularly come to him for advice on many subjects –not just questions for a lawyer.  But, he felt isolated, and he could not bring himself to ask others for help.

## OFFENSE  CONDUCT

David found himself faced with mounting and overwhelming financial pressures.  His law practice was not generating sufficient funds and he was pressured by the financial demands of his wife and by the requirements of supporting his family.

Acting as counsel for the debtor in a proceeding for 199 East 7th Street LLC, in the U.S. Bankruptcy Court for the Southern District of New York, and pursuant to an Order of the Bankruptcy Court of September 30, 2015, David sold the debtor's assets of shares underlying 4 coop apartments. The initial offer for the property had been approximately $1 million, but due to David's efforts it sold for $1.65 million. The proceeds of the sale were placed in a Debtor in Possession account, controlled by the principal of the debtor, James Guarino.  David was not a signatory to the account.

In January 2016, David learned from Guarino, that Guarino had disbursed funds from the Debtor in Possession account.  David knew that such action was unlawful, as Court authorization had not been obtained.  Confronted with substantial financial pressures and without sufficient funds to satisfy his debts and expenses, on or about February 4, 2016, David caused an invoice for professional services rendered in the amount of $30,000 to be sent to Guarino, despite knowing that he had neither sought nor obtained court authorization for payment of legal fees.  Guarino promptly forwarded the $30,000 to David's law firm account, and David accepted the funds.   Court authorization and approval was not sought.   Admitting these acts, David pled guilty before this Honorable Court on March 28, 2018, to embezzlement of this $30,000 from a bankruptcy estate.

17

Notably, David repaid the $30,000 embezzled funds by wiring funds to the court appointed trustee,

Togut, Segal & Segal.[4]

**Criminal Charges**

David was arrested by state law enforcement officers on October 27, 2017, pursuant to an

---

[4] By a letter to this Court dated August 7, 2018, the court appointed trustee in the bankruptcy proceeding for 199 East 7th Street, states that he "write[s] to assist the Court in the sentencing" of Mr. Carlebach.  As counsel for Mr. Carlebach, we certainly have no desire to enter into a dispute with this trustee.  That said, we submit the trustee's letter cannot assist this Honorable Court, because while it makes and repeats numerous allegations, some of which are the basis for Mr. Carlebach's guilty plea, the letter is certainly not objective, nor is it forthcoming.  *For example*, the letter fails to advise this Court of important facts: namely, that Mr. Carlebach wired funds to the trustee.  In fact, Neil Berger, Esq., of the trustee's firm, on November 3, 2016, advised Bankruptcy Judge Chapman as follows:

> Mr. Berger:  ...On October 19th Mr. Carlebach wired 50,000 dollars into the trustee's estate account.  And then, on the 27th, another $10,462.50.
> Mr. Carlebach received 30,000 dollars from the debtor on account of fees....
> The Court:  Right.
>           *   *   *
> The Court:  So the monies that you just detailed were turned over does not include the 30,000 dollars in it?
> Mr. Berger:  It does.
> The Court:  It does.  Okay.
> Mr. Berger:  It does.  There are two buckets of cash.  One was the 30,462.50, which is the amount of the check that Mr. Carlebach wrote from his IOLA account and sent to the title company, which the title company rejected.  That's come back.  The 30,000 that he received from the debtor on account of funds [should state: fees] also came back.

Transcript, November 3, 2016, US Bankruptcy Court, SDNY, Dkt 14-13254, at p 9.

Thus, as the trustee's firm explained, the embezzled $30,000 was repaid by Mr. Carlebach –an important fact missing from the trustee's August 7 letter.

Also absent from the trustee's letter is an accurate explanation of Mr. Carlebach's payment of the transfer tax, that Mr. Carlebach's check to the title company of $30,462.50, dated October 29, 2015, conformed with the title company's request per their invoice of October 27, 2015.  The title company subsequently changed the tax amount sought, by changing their evaluation from a residential transaction to a commercial transaction and therefore subject to a higher tax rate.  Mr. Carlebach challenged that change.

Additionally, the trustee's letter (at p.2; *also* p.1) claims that Mr. Carlebach "facilitated the distribution of approximately $1.1 million of the net sale proceeds."  This is not correct, rather as the PSR ¶9 states, based upon information provided by the U.S. Attorney, Mr. Carlebach was informed of the distributions by the debtor *after* the funds had been disbursed.  Additionally, while the letter suggests that the cancellation of the auction process as well as the sale itself were unauthorized, in fact, and as set forth in the PSR ¶7, the sale was approved by a Bankruptcy Court by Order subsequent to the cancellation of the auction.

Thus, at best, the trustee's letter is misleading; therefore, the letter does not merit reliance.  Present counsel additionally advises Your Honor that on September 9, 2018, by telephone calls and emails, counsel requested documents from the trustee's firm relating to their August 7th letter.  No response has been received and no documents were ever provided.

Indictment in New York County.  Following arraignment, David was detained in State custody at Rikers Island.  Ultimately, after satisfying bail conditions set by this Court and by the State Supreme Court, and after 6 months in Rikers Island, David was released from Rikers on April 24, 2018.

While jailed for 6 months in Rikers Island, David served as the *de facto* Rabbi and Cantor of the jail where he was detained, conducted beautiful Jewish religious services, presented sermons based upon the weekly Torah portion, and always linked his commentaries to repentance or moral or legal principles.  *See* Letter of Roy Hoffmann:  "he counseled myself and numerous other inmates and explained the wrongs he committed, expressing a deep remorse and a new respect for the law."  *Accord*, Letter of Rabbi Akiva Homnick.  He also was usually able to arranged for a small Kiddush with grape juice, matzoh and cake, an innovation on Rikers that took considerable effort by David.

Because of David's efforts to assist and advise other inmates, Jewish and non-Jewish, he earned the respect of all, and was referred to with respect by all as "Rabbi."  When he counseled and when he presented sermons, he emphasized his own failings and remorse, particularly the significant errors in judgment and principles that put him behind bars.   And he encouraged all to learn and grow from their errors.   He was a bulwark of support and encouragement to other inmates.   He even trained a successor to lead the religious services, so services would continue after he left.

As stated above, David was indicted in New York County, Indictment 3198/2017.  On May 3, 2018, David pled guilty pursuant to a plea agreement with the N.Y. County District Attorney and approved by the State Supreme Court, to one count of Scheme to Defraud in the First Degree and one count of Grand Larceny in the Second Degree.  These charges and David's plea concerned his actions while serving as counsel in Bankruptcy Court, and the scheme to defraud count encompasses the charges currently before this Honorable Court.  Concerning sentencing, the state plea agreement provides for a sentence of imprisonment of 2⅓ to 7 years on the scheme count to run concurrent with

19

a term of 1⅓ to 4 years of the larceny charge, both to run concurrent with any sentence imposed in the instant matter. Concerning restitution, the plea agreement also provides for entry of a Judgment Order of $775,000.  The state sentence is scheduled to be imposed on October 25, 2018.

By timely correspondence dated April 4, 2018, we notified the Departmental Disciplinary Committee of the Appellate Division First Department of David's guilty plea in this case. Thereafter, the Disciplinary Committee filed a motion to strike David's name from the roll of attorneys.  David filed a response to said motion, notifying the Appellate Division that he did not contest nor did he oppose the motion to disbar.  He further stated to the Appellate Division that he accepts responsibility for his actions as exhibited by his guilty pleas, and expressed his sincere apology for his conduct.  By an Order entered August 9, 2018, David was disbarred.

## **MITIGATING  CONSIDERATIONS**

David and his wife have for years have an extremely poor or non-existent relationship.  In the years immediately preceding his arrest, David often sought refuge by living outside of the family home.  Clearly, his children have suffered from the absence of a loving, even civil, relationship between their parents.

despite the great consternation of his father, David put himself through college and law school.  David went on to established a small law firm where he provided assistance to people who faced financial and personal ruin.

20



They are both close with David, and they rely upon his advice and emotional support.  They both found it very difficult during the 6 months that David was incarcerated in Rikers Island as they could not reach out for his compassionate support.

Michal, David's daughter, writes to Your Honor:

my father has also always accepted and supported my life's choices, even when considered unconventional, or, quite literally, unorthodox. Examples that come to mind include putting dating on hold in a community that values and prioritizes marriage; taking a break after earning my BA in order to work and explore several career options as opposed to jumping into a Master's program with uncertainty; and moving out of my home when single women traditionally remain at home until marriage in our community- but it was necessary for my growth.

My father is my confidant and friend. Being the eldest child in my family, I have always held a special bond with him. He was always the parent I turned to when I needed a shoulder to cry on or a listening ear. When I failed, or made mistakes, he would remind me that I was more than my mistakes, and encourage me to learn from them. He never judged me for my mistakes, but motivated me to do better, to be better. When I was willing to settle for less, he reminded me of my true value. Recently, I contemplated marriage with a young man who was not an ideal marriage partner. My father was the one who spent hours talking to me about the relationship, forcing me to think critically and face the fact that I was not making wise choices. Even during his incarceration he continued to advise and encourage me.

*   *   *

I ask you to consider the fact that I share a special bond with him, as he is the parent I connect with and depend on. Most of all, I ask you to consider the fact that he has contributed greatly to my character development and growth as an individual, and without his guidance and love I will be lost.



In addition to caring for his children, David has taken a leading role in caring for his elderly and infirm parents, as his sister Elisheva writes to Your Honor:

> David goes out of his way to show love and concern for our elderly parents. He is probably unaware of how deeply my father suffered during the months in which he was away. My father is 93 years old, fighting cancer, losing his remaining eyesight—but I never saw him cry until we told him that David was in Rikers Island and facing more time after pleading guilty. His anguish over this development is etched on his face. My mother now has mild dementia and is mostly housebound. David's first visit was to them, and he is there now as often has he can be, sometimes sleeping over with them, trying to assure them that he will be OK.

In his letter to Your Honor, David's younger brother, Emanuel, also writes of the important support that David has provided to their parents, taking them to their frequent doctor appointments, shopping for them, caring for them in their home, as well as to himself (Emanuel) who is stricken with Parkinson's Disease. *See also* Letters of Abraham Carlebach, Sarah Carlebach Marmorstein.

David has fully accepted responsibility for his actions. He promptly offered to plead guilty and entered pleas in both this Court and in State court. His state court plea includes his agreement to incarceration of 2⅓ to 7 years, and his plea agreement with the U.S. Attorney includes a stipulated Guidelines range of 10 to 16 months. He has additionally consented to disbarment, understanding that due to the nature of his crimes, his legal career is permanently ended after 27 years as an

attorney.  "[H]e has expressed to me his deep regrets of engaging in criminal conduct, conduct unbefitting an attorney."  Letter of Rabbi Akiva Homnick.

David also faces significant economic hardships, hardships that he must face without the ability to practice law.  At present he has no assets, the family home was in foreclosure and was sold by auction on September 13, 2018, there was no surplus and David did not receive any proceeds from the sale.  Concerning his marriage, David and his wife have agreed to a civil and religious divorce, and seek to complete these procedures before David begins imprisonment.

Consistent with his acceptance of responsibility, and his great remorse, David plans to return to trying to help people in need.  David plans to use his religious knowledge and his prison experience to counsel offenders, as well as others in need.  Toward these goals, David voluntarily participated in and completed six FEDCAP programs (Certificates attached as an Exhibit), and attended all available rehabilitation courses while in Rikers Island.  David also plans to continue to assist poor Jewish Congregations by volunteering to lead religious services as a substitute for a Rabbi or as a Cantor.  David has assisted synagogues in this manner for many years (*see* Letter of Elisheva Carlebach, David served as a volunteer Cantor for over 10 years at her husband's congregation), and this year for the Jewish High Holy days, David served as the Cantor at the Home of the Sages of Israel Synagogue on the lower east side.  *Accord*, Letter of Rabbi Abraham Laks, Esq., of the Eldridge Street Synagogue on the Lower East Side:

> As of the time David was incarcerated on Rikers Island, our congregation went through a difficult period as we had become accustomed to relying on David's kindness and talent.  The willingness of one of our congregants to go through the difficulty, time consuming and traumatic experience of visiting David on Rikers Island a number of times in itself attests to how meaningful David's dedication was to our Synagogue.
> ...Despite his admitted wrongdoing, I still have the utmost respect for how dedicated he remains to our congregation as well as all those individuals he continues to help, in what must be the most challenging period in his life.  I also know that David has

23

expressed sincere regret for his conduct.

*See also*, Letters of Ezra Turkel, Kalman Nochlin, Rabbi Romm.  David has also volunteered as an inspirational Cantor and has led religious services in Nursing Homes (*see* Letter of Chaim Katz), and ministered to disabled and troubled individuals as part of his renewed sense of purpose and mission. David may also return to Rabbinical studies and pursue rabbinical ordination.

As an attorney, David often assisted people who could not afford to pay for the legal services he provided, and often he assisted people who found themselves confronted by wealthier, more powerful and more influential people, and David risked his law practice, his family's community standing, because he knew is was right the right thing to do.  *See, e.g.*, Letters of, Joseph Carlebach: "he was always driven by a sense of mission to help others and go beyond the call of duty to help people in tough situations;"  Michal Carlebach: "My father is unafraid to take a stand, even if it is unpopular, and no other lawyers in the community would get involved;" Ben Hirsch, President of Survivors for Justice: "David ... risked serious financial loss by getting involved since much of his clientele came from within this community and were his involvement in this issue to become known he would have been severely ostracized by the communal leadership."  In the end, David's reputation was greatly enhanced by these selfless actions, but the loss of this laudable reputation is extremely painful to David.

Truly, David has learned a very painful lesson, and has already received significant punishment: 6 months at Rikers Island and the forthcoming incarceration in a State prison for 2⅓ to 7 years plus a judgment of restitution, disbarment and consequent affect on earning ability, loss of reputation, separation from his elderly parents and from his needy children.  Probation clearly considered all these significant factors and that his only other arrest is the related state case, and they recommend a non-Guidelines sentence below the stipulated range, namely, 5 months incarceration.

24

Section 3553 declares that, "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" as the goals of sentencing.   We respectfully submit that the sentence recommended by Probation, particularly when viewed in combination with the other punishments, will be sufficient to satisfy the purposes of sentencing as set forth in section 3553(2).   Moreover, we respectfully request that any sentence imposed by this Court be ordered to run concurrent with the sentence to be  imposed by the State court, and further request that this Court order that David receive full credit for the time served as a prisoner at Rikers Island from October 27, 2017 when he was detained until his release on bail on April 24, 2018.[5]

### CONCLUSION  and  REQUEST

For the Reasons as Set Forth Above, and Consistent with the Requirements and Purposes Set Forth in 18 USC section 3553, this Honorable Court Is Respectfully Asked to Impose a Non-Guidelines Sentence Below the Guidelines Range Set Forth in the Plea Agreement.


Dated:   New York, New York
      September 21, 2018          *Respectfully submitted,*

                           /s/
                    Richard A. Finkel
                    Richard A. Finkel, Esq., & Associates, PLLC.
                    *Counsel for Defendant Pincus David Carlebach*
                    270 Madison Avenue, Suite 1203
                    New York, New York 10016
                    212-689-8600

---

[5] It is submitted that the state charges "were part of the same course of conduct" (USSG §1B1.3(a)(2)) as the instant federal offense of conviction.  Thus, under USSG §5G1.3(b)(1), Mr. Carlebach is entitled to receive credit against any federal term of imprisonment for the time he served in Rikers Island.  *See United States v. Descally*, 254 F3d 1328 (11th Cir 2001).

Additionally, pursuant to USSG  §5G1.3(b)(2) and (c), Mr. Carlebach is entitled to have any sentence of incarceration imposed by this Court run concurrent with the sentence to be imposed by the state court.